UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAROL DOHERTY,

        Plaintiff,

-against-

NEDERLANDER PRODUCING CO.,
JOHN DOE (1-12) and XYZ CORP.,

        Defendants.

No. 04 Civ. 3324 (LTS) (JCF)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/04/06

## MEMORANDUM OPINION AND ORDER

In this employment discrimination action, Plaintiff Carol Doherty ("Doherty" or "Plaintiff"), a former usher at the Marquis Theater in Manhattan at 1535 Broadway, alleges that Defendant Nederlander Producing Company ("Nederlander" or "Defendant"), her former employer, neglected to take action to remedy a hostile work environment and fired her in retaliation for reporting such environment in violation of Title VII of the Civil Rights Acts of 1964, as amended ("Title VII"), 42 U.S.C. section 2000e et seq. Plaintiff makes additional claims for relief under 42 U.S.C. section 1981, 42 U.S.C. section 1985 and 42 U.S.C. section 1988. Plaintiff also makes a claim of intentional infliction of emotional distress. The Court has subject matter jurisdiction of the federal law claims pursuant to 28 U.S.C. section 1331.

Defendant moves for summary judgment dismissing Plaintiff's complaint in its entirety. The Court has reviewed and considered carefully all of the parties' submissions and arguments. For the reasons that follow, Defendant's motion is granted, and the federal law claims asserted in Plaintiff's complaint are dismissed. In light of this disposition of the federal claims, the Court declines to exercise supplemental jurisdiction over the state law claim for

Copies mailed and given to plaintiff and defendant counsel
Chambers of Judge Swain

intentional infliction of emotional distress.

## BACKGROUND

The following material facts are undisputed unless otherwise stated.[1] Carol Doherty was employed by Nederlander as an usher at the Marquis Theatre from some point before 1989 until November 2002. (Defs.' Local Rule 56.1 Statement ("Def. 56.1") ¶ 1.) She was an at-will employee. (Id.) James Johnson ("Johnson") also worked for Nederlander at the Marquis Theatre. (Id. at ¶ 2.) He worked as a ticket taker at the theater between 1992 and November 2002; Johnson never had any supervisory authority over Doherty. (Id.) Doherty's supervisors during the time period encompassing the incidents alleged in her complaint were Timothy Pettolina (Assistant House Manager from March 1996-July 2002 and thereafter House Manager), David Calhoun (House Manager from 1994 to July 2002), and Rosaire ("Lulu") Caso (Head Usherette since 1989). (Id. at ¶ 3.)

---

[1] Local Civil Rule 56.1 of this Court requires a party moving for summary judgment to include in its motion papers a "separate, short and concise statement, *in numbered paragraphs*, of the material facts as to which the moving party contends there is no issue to be tried." S.D.N.Y. Local Civil Rule 56.1(a). The party opposing the motion is required to respond with "*a correspondingly numbered paragraph responding to each numbered paragraph of the statement of the moving party.*" Local Civil Rule 56.1(b). The statements must be accompanied by citations to admissible evidence. Local Civil Rule 56.1(d). Where an opposing party fails specifically to controvert the moving party's statement, the moving party's statement is deemed admitted for purposes of the motion. Local Civil Rule 56.1(c). Here, Plaintiff failed entirely to make the requisite specific response to Defendant's moving statement. Instead, she proffered a rambling, conclusory "counterstatement." Defendant's assertions of material fact in its moving statement are deemed admitted for purposes of this motion practice. Furthermore, the Court has reviewed Plaintiff's "counterstatement" and finds that it does not raise any genuine dispute as to any factual issue material to the resolution of the instant motion.

Plaintiff became friends with Johnson in 2000. (Deposition of Carol Doherty ("Doherty Dep.") 69-70.) They engaged in a consensual romantic relationship for several months in 2001. (Def. 56.1 ¶ 4; Doherty Dep. 70.) They saw each other "all the time at work" and socially outside of work. (Def. 56.1 ¶ 4; Doherty Dep. 70-71.) Doherty stayed at Johnson's apartment "a few times," and Johnson treated her to dinner and to movies. (Def. 56.1 ¶ 4; Doherty Dep. 71-72.) While they were dating, Plaintiff and James Johnson had a few disagreements. (Def. 56.1 ¶ 5; Doherty Dep. 75-76.) Sometimes during these disagreements, they would not speak to each other for periods of up to two weeks. (DR56.1 ¶¶ 5, 8; Doherty Dep. 76.) Doherty claims to have ended the relationship in November 2001. (Pl.'s Counterstatement of Facts ("Counterstatement") ¶ 5.) Doherty also claims that Johnson "refused to accept the termination of the relationship and insisted that the relationship was still on" and, "[s]hortly thereafter being spurned by Plaintiff," commenced a course of conduct that Plaintiff characterizes as consisting of sexual harassment. (Id. ¶¶ 6-7.) Doherty alleges that, between the breakup and June 2002, Johnson began harassing her by, inter alia, making phone calls, making comments regarding her personal life, engaging in "surveillance" of her, and by calling her names and using obscenities in reference to her. (Id. ¶7; Doherty Dep. 79, 81-5, 100, 120, 125-6.)

In June 2002, there was a physical altercation between Doherty and Johnson in the Marquis Theatre. (Def. 56.1 ¶ 9, Counterstatement ¶ 7h.) There were no witnesses to the incident, and Doherty and Johnson each gave conflicting accounts of what had happened. (Def. 56.1 ¶ 10.) After receiving these conflicting accounts, David Calhoun, the House Manager, discussed the incident with Herschel Waxman, Senior Vice President of Labor Relations for

Nederlander and Susan Martin, Business Agent and Union Representative for Local 306, the union for ushers and ticket takers. (Def. 56.1 ¶ 11.) They reached the conclusion that both employees were at fault and ultimately decided that both Johnson and Doherty should be suspended but would be allowed to work at different theaters during the period of their suspension. (Id.) At this point, Plaintiff told Calhoun that Johnson had been calling her at home or that he would call members of her family. (Affidavit of David Calhoun ("Calhoun Aff.") ¶ 10.) According to Mr. Calhoun, she did not claim that these phone calls were affecting her work. (Id.) Plaintiff characterizes her complaint differently, asserting that she also complained about a theft of her cell phone and "sexual harassment." (Counterstatement ¶ 13.)

Doherty and Johnson returned to work at the Marquis Theatre in July 2002. Employees who provided affidavit testimony stated that it was their impression that the Plaintiff and Johnson had resumed their tumultuous "relationship and/or friendship." (Def. 56.1 ¶ 12; Affidavit of Rosaire Caso ("Caso Affidavit") ¶ 8; Affidavit of Jamie Fritze ("Fritze Aff.") ¶ 7; Affidavit of Barbara Newsome ("Newsome Aff.") ¶¶ 4, 10; Affidavit of Rita Smith ("Smith Aff.") ¶¶ 15-16.) Plaintiff asserts that, after they returned to work, Johnson would refer to her using profane language when she did not want to talk to him, although she admits responding to these comments with more profanity. (Doherty Dep. 153-56). She asserts that Johnson continued to ask questions and make comments about her personal life and his desire to pursue sexual relations with her, id. at 125-26, and that to talk to her he would grab her arm. (Id. at 130.) Plaintiff also alleges that Johnson would send text messages to her on her new boyfriend's cell phone. (Id. at 161.)

Plaintiff spoke to Ms. Caso regarding these occurrences once after her return from

suspension. (Def. 56.1 ¶ 25; Doherty Dep. 156-7.) The conversation occurred a few weeks after Doherty's return, and Caso told Doherty and Johnson to stay away from each other. (Def. 56.1 ¶ 25; Doherty Dep. at 121; Caso Aff. ¶ 8.) According to Caso, early on November 9, 2002, Plaintiff attempted to show her some text messages that Plaintiff had received from Mr. Johnson, but Caso was too busy to understand exactly what Doherty was trying to tell her. (Caso Aff. ¶ 9.) Doherty does not remember complaining to Pettolina on any specific occasion. (Doherty Dep. 225.) Calhoun was not working at the theater after July. (Def. 56.1 ¶ 3.)

On November 9, 2002, Doherty and Johnson were engaged in several physical altercations on and around the theatre property. The first altercation occurred in the breezeway outside the Marquis Hotel. (Def. 56.1 ¶ 14.) There were conflicting accounts of what transpired. (Id. at ¶ 15.) The fight was broken up by hotel security guards. (Doherty Dep. 175.) As a result of the fight, Mr. Johnson had a scratch on his face. (Id. at 180; Def. 56.1 ¶ 14; Caso Aff. ¶ 11; Newsome Aff. ¶ 12; Smith Aff. ¶ 20.) According to several witnesses, a second altercation ensued in the ushers' room. (Def. 56.1 ¶ 16; Caso Aff. ¶ 11; Newsome Aff. ¶ 12; Smith Aff. ¶ 20.) The altercation was primarily a verbal exchange. (Def. 56.1 ¶ 16; Caso Aff. ¶ 11; Smith Aff. ¶ 20.) However, witnesses said that Doherty had to be held back because she was trying to lunge at Johnson and that both made threats toward each other. (Caso Aff. ¶ 11; Smith Aff. ¶ 20.)

The third altercation took place in the breezeway, and a New York police officer, John O'Gormon, was summoned to the scene. (Def. 56.1 ¶ 17-18.) There are differing accounts of what happened during the altercation. By the time Officer O'Gormon arrived on the scene, he saw only a verbal altercation. (Affidavit of John O'Gormon ("O'Gormon Aff.") at ¶ 9.)

Ultimately he decided not to charge either Doherty or Johnson. (Id. at ¶ 10.) Doherty claims that Johnson swung at and hit her with his motorcycle helmet and then physically restrained her. (Doherty Dep. 182.) She also claims that she did not physically attack or physically or verbally threaten him in any way. (Id.) Other employees assert that Plaintiff flicked cigarette ashes at Johnson and spat on him. (Fitze Aff. ¶ 6; Newsome Aff. ¶ 13.) They also allege that Doherty was an active participant in the verbal altercation and that she used foul language. (Fitze Aff. ¶ 6; Newsome Aff. ¶ 13.) At least one employee witness does not believe that Doherty was actually hit by the motorcycle helmet. (Fitze Aff. ¶ 6.) These factual disputes as to the details of the incident are not material.

After the incidents on November 9, Timothy Pettolina, the House Manager, conducted an investigation to determine what had happened, and determined that Doherty was at least partly at fault. (Def. 56.1 ¶ 20.) Doherty told him after the incident that Johnson had been sending her text messages. (Pettolina Aff. ¶ 11.)

Herschel Waxman made the decision to fire Ms. Doherty after hearing about the incidents of November 9. (Def. 56.1 ¶ 21; Waxman Aff. ¶ 5; Pettolina Aff. ¶¶ 12-13.) Plaintiff had never complained to Waxman about any alleged harassment. (Def. 56.1 ¶ 22; Doherty Dep. 232.) Waxman was not aware of any such complaints at the time he made the decision to terminate her employment. (Def. 56.1 ¶ 23; Waxman Aff. ¶ 6.) Johnson's employment was also terminated after the November 9, 2002, incidents. (Def. 56.1 ¶ 24; Caso Aff. ¶ 13; Pettolina Aff. ¶ 12; Waxman Aff. ¶ 5.)

In April 2003, Plaintiff filed a claim with the Equal Employment Opportunity Commission ("E.E.O.C."). The E.E.O.C. issued and mailed to Plaintiff a right to sue letter in

September 2003. (Def. 56.1 ¶ 29; Doniak Affidavit Ex. E; Preliminary Pretrial Statement ¶ C.11-12.) In her complaint, Plaintiff alleged that she never received the letter and that it was only received by her lawyer in February 2004. (Complaint ¶ 3.) In her deposition, Plaintiff testified that she had received the letter but disclaimed any recollection of when she had received it, and then testified that she believed she would have received it in September 2003. (Dep 376-78.) In an unsigned, unsworn "affidavit" submitted in connection with her opposition to the summary judgment motion, Plaintiff asserts that she did not receive the letter but was, instead, told about it by her lawyer in February 2004. (Aff. of Carol Doherty ¶ 2.) The complaint in the instant matter was filed on April 30, 2004.

Defendant moves for summary judgment, arguing that Plaintiff's Title VII claim is untimely and that her Title VII and other federal claims also fail on the merits.

DISCUSSION

*Summary Judgment Standard*

Summary judgment shall be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The party against whom summary judgment is sought . . . 'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (alteration and

emphasis in original)). "A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

*Timeliness of Title VII Claim*

A lawsuit asserting a Title VII cause of action must be filed within ninety days of the E.E.O.C.'s issuance of a right to sue letter. 42 U.S.C. section 2000e-5(e)(1). Here, the EEOC's right to sue letter was issued on September 10, 2003 and Plaintiff's action was not commenced until April 30, 2004. The evidence of record consists of the letter itself, the parties' stipulation that it was issued and mailed on or about September 10, 2003, and Plaintiff's deposition testimony concerning her recollection that she did receive the letter, her habits of picking mail up regularly at the address to which the letter was sent and her belief that she would have received the letter by September 2003. Plaintiff's action was filed some seven months after September 2003 – clearly outside of the 90-day statutory period. Plaintiff's complaint, and her unsworn, unsigned affidavit in opposition to this motion advance a different version of the events, positing that Plaintiff only learned of the letter through her lawyer in February 2004. The Court finds that the evidence of record, even read in the light most favorable to Plaintiff, establishes that the right to sue letter was issued to and received by Plaintiff in or about September 2003 and that her Title VII claim is therefore untimely. Her allegation in her complaint, and her non-evidentiary proffer of the unsigned, unsworn affidavit, are insufficient to raise a genuine issue of material fact in this regard. Defendant is entitled to summary judgment dismissing Plaintiff's Title VII claim as untimely.

For the following reasons, Defendant is also entitled to summary judgment on the merits of Plaintiff's Title VII claims.

*Sexual Harassment and Hostile Work Environment Claims*

"[A] plaintiff seeking relief for sexual harassment may presently proceed under two theories: (1) quid pro quo, and (2) hostile work environment." Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994). The facts alleged and arguments presented by Plaintiff do not support a claim of quid pro quo harassment. To assert such a claim, a plaintiff would have to demonstrate that either the acceptance or rejection of sexual advances made by an individual formed the "basis for decisions affecting the compensation, terms, conditions or privileges of her employment." Id. In this case, Plaintiff alleges that a coworker with no supervisory authority over her was "harassing" her in and out of the workplace. She makes no claim that he had any control over her compensation or terms of employment or that any supervisor linked her compensation or terms of employment to her responses to Johnson's advances.

The facts and arguments presented by Plaintiff are in the nature of a hostile work environment claim. To demonstrate a hostile work environment, a plaintiff must show that "'(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" Petrosino v. Bell Atlantic, 385 F.3d 210, 221 (2d Cir. 2004) (alteration in original).

A plaintiff pursuing a hostile work environment claim "'must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually

constituted discrimina[tion] . . . because of . . . sex.'" Stepheny v.Brooklyn Hebrew School for Special Children, 356 F. Supp. 2d 248, 263 (E.D.N.Y. 2005) (alteration in original) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). This is because "'Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex discrimination. . . . The plaintiff cannot turn a personal feud into a sex discrimination case.'" Stepheny, 356 F. Supp. 2d at 262 (quoting Succar v. Dade County School Board, 60 F. Supp. 2d 1309, 1314 (S.D. Fla. 1999) (alterations in original)). Thus, "the pertinent question is whether the harassment occurred because of an individual's sex as male or female." Id. at 263.

In the instant matter, Plaintiff alleges that Johnson, a coworker, "harassed" her, causing mental anguish and altering the conditions of her work environment. However, she fails to allege or to proffer evidence that the impetus for this behavior was gender-based hostility. Rather, she acknowledges that she had been personally involved with Johnson, that she had terminated their relationship, and she alleges that his conduct stemmed from his frustration regarding the termination of their consensual personal relationship. Her description of their personal relationship is largely corroborated by the undisputed evidence indicating that co-workers perceived an on-again, off-again relationship punctuated by periods of hostility. The alleged conduct itself – including questions regarding Plaintiff's new boyfriend, comments indicating a desire to resume the relationship and anger when the Plaintiff refused to communicate with him, and physical actions consistent with such anger – also indicates that Johnson was motivated by frustration about the failed relationship. Johnson did allegedly use terms with sexual connotations, but the use of such words does not "necessarily show that there is

discrimination based on the plaintiff's sex." Id. at 264 (citation omitted).

In similar cases, courts have refused to consider such behavior alleged to constitute "discriminatory intimidation" creating a hostile work environment. For example, in Stepheny, the court held that it was not actionable discrimination when the former mistress of the plaintiff's husband harassed the plaintiff at work because the harassment was based on personal animosity, rather than sex or race. Stepheny, 356 F. Supp. 2d at 263-64. Likewise, in Succar, the court determined that the school board would not be held responsible for a coworker's harassment of the plaintiff because such harassment was based on a prior personal relationship, not plaintiff's sex. Succar, 60 F. Supp. 2d at 1315-17.

Plaintiff has offered no evidence from which a reasonable factfinder could determine that she has met her prima facie burden of demonstrating that she was subjected to gender-based workplace harassment or hostility actionable under Title VII. Defendant is therefore entitled to summary judgment dismissing Plaintiff's Title VII sexual harassment and hostile work environment claims.

*Retaliation*

Plaintiff asserts that Defendant retaliated against her for complaining about the alleged sexual harassment. Plaintiff attributes her termination, as well as her earlier suspension and temporary transfer, to such retaliation. Plaintiff's claim of retaliation under Title VII must also fail. To establish a claim for retaliation, a plaintiff must first offer proof of a prima facie case showing that:

> (1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff based upon her activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer.

Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) (citation omitted). Protection is afforded by Title VII to those challenging discrimination prohibited by the statute and to those who participate in proceedings undertaken pursuant to the statute. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). Once a plaintiff has established a prima facie case, "a presumption of retaliation arises." Id. To counter that presumption, the employer has the burden of offering a legitimate, non-retaliatory reason for the adverse employment action taken against the employee. Id. The burden then shifts back to the plaintiff employee to show that the legitimate motive offered by the employer is "pretext," and that retaliation was a substantial cause of the adverse employment action. Id. See also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973) (establishing the burden-shifting analysis used in both disparate treatment and retaliation cases).

It is questionable whether Plaintiff can meet her prima facie case burden, as her proffers do not make it at all clear that she complained to supervisors of conduct indicative of gender-based hostility. However, viewing all facts in the light most favorable to Plaintiff and taking as true her assertions that she complained about specific instances of Johnson's conduct to supervisors on a number of occasions and characterized that conduct as sexual harassment, the Court will assume for purposes of this analysis that Plaintiff has put forward a prima facie case. Similarly, while the variations in Plaintiffs' proffers concerning the frequency, timing and subject matter of her complaints make it questionable whether she can show a sufficient temporal

connection between the complaints and the suspension and/or termination to support the causal connection prong of the standard, the Court will assume for purposes of this analysis that Plaintiff has met that aspect of her initial burden as well.

Once a plaintiff has made out a prima facie retailiation case, the defendant has the burden of coming forward with a legitimate, nondiscriminatory reason for the adverse employment actions. Here, Defendant proffers that Plaintiff and Johnson were involved in physical altercations on Defendant's premises immediately before each of the actions was taken, and that the actions were taken after investigations of the incidents in which both Plaintiff and Johnson were found to be at fault. After the employer has come forward with such an explanation, it is Plaintiff's burden to demonstrate that the reason given is merely a pretext for prohibited discrimination. On the record before the Court, no reasonable factfinder could determine that Plaintiff has met her burden of showing that the reasons proffered by Defendant are pretextual. Indeed, Plaintiff does not dispute that the altercations occurred or that they were investigated. Moreover, Johnson was subjected to the same measures (namely suspension and, ultimately, termination). Defendant is entitled as a matter of law to summary judgment dismissing Plaintiff's retaliation claims.

## OTHER CLAIMS

Plaintiff's complaint also purports to assert causes of action, based on the same underlying circumstances, pursuant to 42 U.S.C. section 1981, 42 U.S.C. section 1985, and 42 U.S.C. section 1988. These claims must also be dismissed as a matter of law in this case. Section 1981 authorizes claims premised on racial discrimination, Mian v. Donaldson, 7 F.3d

1085, 1087 (2d Cir. 1993), and no such discrimination is alleged here. Sections 1985 and 1988 are also inapposite to Plaintiff's allegations of wrongdoing. Summary judgment dismissing these claims will, accordingly, be entered in Defendant's favor.

In light of the dismissal of all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction of her state law claims pursuant to 28 U.S.C. section 1367.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment dismissing Plaintiff's federal claims (counts I and II) as to Nederlander is granted. The Court declines to exercise jurisdiction of Plaintiff's state law claims (count III), and they are, accordingly, dismissed.

There is no indication that efforts have been made to identify or to serve the "Doe" or "XYZ" defendants. The Court Directs Plaintiff to show cause, in writing served and filed by August 28, 2006, as to why the complaint should not be dismissed without prejudice as against the nominal parties.

SO ORDERED.

Dated: New York, New York
August 4, 2006

_____
LAURA TAYLOR SWAIN
United States District Judge